G9u1schs

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          16 Cr. 278 (WHP)

5    STUART SCHLESINGER,

6              Defendant.                  Sentencing

7    ------------------------------x

8                                          New York, N.Y.
                                           September 30, 2016
9                                          2:38 p.m.

10
     Before:
11
                    HON. WILLIAM H. PAULEY III,
12
                                           District Judge
13

14                         APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  MATTHEW J. LAROCHE, ESQ.
17        Assistant United States Attorney

18   LAW OFFICES OF MURRAY RICHMAN
          Attorneys for Defendant
19   BY:  MURRAY RICHMAN, ESQ.
          KAREN L. DEL VECCHIO, ESQ.
20

21   ALSO PRESENT:  JAMES HILLIARD, Special Agent, FBI

22

23

24

25
```

G9u1schs

```
 1              (Case called)
 2              MR. LAROCHE:  Good afternoon, your Honor.  Matt
 3   Laroche for the government.  And with me is Special Agent James
 4   Hilliard from the FBI.
 5              THE COURT:  Good afternoon, gentlemen.
 6              MR. HILLIARD:  Good afternoon.
 7              MR. RICHMAN:  Good afternoon, your Honor.  Murray
 8   Richman for defendant.  And I'm assisted by my associate Karen
 9   Del Vecchio.
10              THE COURT:  All right.  Good afternoon, Mr. Richman
11   and Ms. Del Vecchio.
12              MS. DEL VECCHIO:  Good afternoon.
13              THE COURT:  I note the presence of the defendant,
14   Mr. Schlesinger, at counsel table.
15              This matter is on for sentencing.  Are the parties
16   ready to proceed?
17              MR. LAROCHE:  Yes, your Honor.
18              MR. RICHMAN:  We are.
19              THE COURT:  Mr. Richman, have you reviewed with your
20   client the presentence investigation report?
21              MR. RICHMAN:  I have, sir.
22              THE COURT:  Are there any factual matters set forth in
23   the report that you believe warrant modification or correction?
24              MR. RICHMAN:  I do not, sir.
25              THE COURT:  Mr. Laroche, are there any factual matters
```

G9u1schs

```
 1    in the report that the government believes warrant modification

 2    or correction?

 3              MR. LAROCHE:  No, your Honor.

 4              THE COURT:  Before we proceed, with respect to the

 5    question of restitution, the parties have handed up to the

 6    Court a Consent Preliminary Order of Forfeiture in the amount

 7    of $5,549,017.  Is that the agreed amount of restitution in

 8    this case?

 9              MR. LAROCHE:  Yes, your Honor.

10              MR. RICHMAN:  It is, your Honor, subject to certain

11    materials we're making available to the United States

12    Attorney's Office with relation to a modification of a portion

13    thereof, but not a significant portion thereof.

14              THE COURT:  All right.  Very well.

15              Before I hear from the parties in this case, the

16    government has informed me that a number of victims wish to

17    address the Court.  I intend to hear from each of them now.  I

18    have read all of the submissions of the parties and the

19    numerous letters that I've received from victims, including one

20    letter that was handed up to my deputy a half hour ago.  I

21    assume, Mr. Richman, that you've seen them all.

22              MR. RICHMAN:  I have seen them all, your Honor, and I

23    have received a copy of the one that was handed up a half hour

24    ago.

25              THE COURT:  Very well.  And so I've been provided with
```

G9u1schs

a list.  I'm going to ask Margaret Last and/or Kevin Last to
come forward, if they wish, and address the Court.

          Please just state your name, if you would.

          MS. LAST:  My name is Margaret Last.

          THE COURT:  Thank you.

          MS. LAST:  And I want to thank you, your Honor, for
letting me speak.

          I am a victim of Stuart Schlesinger.  After a
negligent malpractice incident in 2010, I sought the help of
Julien & Schlesinger law firm.  Previously this law firm helped
me in an accident case in 2009.  I worked with his son, Michael
Schlesinger, and other lawyers in the firm during the standard
process of a lawsuit, until the award settlement stage came to
fruition.  Stuart Schlesinger handled all financial awards.

          I cannot count how many times I spoke to Stuart
regarding the status of both cases.  His excuses were
neverending -- he was short-staffed, he was making sure
everything was in order, he had a virus, he had problems with
his back, and his knee, the office was moving, he didn't know
how to work a fax machine, the girl in the office must have
made an error, he didn't want to speak on the phone too long,
etc.

          The frustration level was all-consuming physically and
emotionally.  I was trying my best to recover from the numerous
surgeries I needed from the malpractice suit.  I lost my job.

G9u1schs

My husband had to take early retirement to take care of me
during these numerous surgeries.  Stuart knew all this
information and expressed empathy to both me and my husband.
He was reassuring that I would receive a very good settlement
out of court.

A settlement of the malpractice was made.  I received
a call from Stuart to finalize the amount.  I received an award
of $875,000.  The check was hand delivered to Stuart within two
days after the conclusion of the settlement on June 2nd.
Stuart said it would be $660,100 I was to receive.  I was
relieved and believed things would work for us.  I called
Stuart numerous times.  He said he had no set date when I would
receive my award.  Stuart expressed on several conversations
that he wanted to make sure all the paperwork was in order and
that should be shortly.  It never came.

I became very restless and nervous.  I could not
sleep.  My husband was aggravated and felt Stuart was up to
something.  We found out Stuart was disbarred through a news
site on the internet.  Stuart claimed this was -- claimed to us
everything would be okay.  During November -- that everything
would be okay.

During November and early December, we called almost
daily.  On every call, Stuart claimed he was meeting people to
get funds.  Stuart even set up a meeting to meet me and my
husband at a coffee shop.  He gave us a phony check and asked

G9u1schs

1    that we not cash it for two weeks.  Within two weeks, Stuart

2    was arrested by the FBI.  I was physically and emotionally

3    wrecked.

4            I am frightened as to how we will be able to suffice

5    paying ongoing medical bills, our monthly bills, and many other

6    bills.  Stuart Schlesinger stole from me, like a common thief.

7    I was so hurt by him and angry with myself for believing him.

8    I will never be able to forgive him for what he's done to me

9    and my family.

10           Thank you.

11           THE COURT:  Thank you, Mrs. Last.

12           MR. LAST:  I'm Kevin Last, your Honor.  Thank you for

13   letting me speak.

14           I'm a victim of Stuart A. Schlesinger.

15           In 2011, my wife and I met with the son of Stuart A.

16   Schlesinger, Michael Schlesinger, and signed a formal agreement

17   with the law firm Julien & Schlesinger, to sue a doctor who

18   misdiagnosed my wife.  I did some due diligence on the firm,

19   and it was rated one of the top ten law firms in New York City

20   for malpractice cases.  I had no idea at this time that Stuart

21   Schlesinger was stealing from his clients.

22           My wife was close to a below-the-knee amputation on

23   the right leg and sepsis.  In order to save her, the now

24   treating doctor performed a series of surgeries that left her

25   in a wheelchair for nine months with 36 bolts and pins

G9u1schs

protruding from the right leg.  I was emotionally devastated it

see her like this.  She did not have a good recovery and to

this day needs constant assistance.  I had to leave work and

take care of her.

In 2012, my wife lost her job, and I was not working.

Numerous bills were coming in.  Both my wife and I did

everything Stuart Schlesinger asked of us, and he told us that

we would get a settlement that would help our financial

situation.

In June of 2015, Stuart Schlesinger called us at home

and said the case settled for $875,000.  We received a letter

from the defendant's insurance company stating the check was

sent to our lawyer.  I called Stuart Schlesinger immediately

and asked for the money.  Stuart gave me many excuses why he

could not pay us, including the death of his daughter-in-law.

Stuart Schlesinger received a settlement award money

two weeks after his disbarment from law practice.  He never

said he was disbarred or received our money.  Stuart only used

my wife and I as a means to get and steal our money.

I'm still having nightmares about this.  How does a

lawyer who takes an oath to protect his clients steal from

them?

In early 2015 he met with my wife and I to give us a

bouncing check in the amount of $660,000.  Both my wife and I

were overwhelmed by his actions.  We are in a state of limbo

G9u1schs

1    and do not know what or how we will survive.

2          We were contacted by the FBI and told of his arrest

3    for his criminal actions.

4          I will never forgive him, accept any apology, and I do

5    not believe he is repentant for his actions.  Stuart is

6    shame-faced only because he got caught.

7          I ask this Court to make him pay us immediately in

8    full and give him the maximum jail sentence under the law.

9          Thank you, your Honor.

10          THE COURT:  Thank you, Mr. Last.

11          Would Sandi Bacon come forward.

12          MS. BACON:  Hi, Stuart.

13          My name is Sandi Bacon, your Honor, pronounced

14    "bacon."

15          I would like to thank the state's attorney, the FBI,

16    and the victims coordinator for their compassion.

17          Never in my wildest dreams did I think I would be

18    homeless at 72, but I am, because of the actions of Stuart

19    Schlesinger.  Not only did he steal my settlement money, he

20    robbed me of my self-respect and dignity.  And when the money

21    ran out, I faced the eviction judge alone, on December 2, 2011.

22          That morning, at the courthouse, he had called in a

23    panic.  "You have to fire me.  I'm sending Michelle down.  You

24    need to sign some papers.  It will go better for you without a

25    lawyer.  I'm not stealing your money.  I'm not abandoning you."

G9u1schs

1    I pleaded with the judge for my son's life:  "Your Honor, it

2    says 'In God We Trust' over your head.  My son is so sick.  We

3    have no place to go.  I'm afraid he's going to die."  The judge

4    laughed and said I deserved to be evicted because of the amount

5    of my back rent and banged the gavel.  I was to vacate my

6    beautiful apartment in six days.

7            Several months later, in a failed suicide attempt, my

8    son leapt from the third floor fire escape.  Mercifully, an

9    awning broke his fall, or Schlesinger would have taken my son

10   from me as well.

11           On September 27, 2008, I was filming -- I'm a

12   filmmaker -- at DUMBO Arts Street Festival, asking people who

13   they thought won the first presidential election, or debate,

14   when an SUV came out of nowhere and ran over my leg.  After a

15   painful operation and recovery, I was bedridden and unable to

16   walk for a year, fell behind on my rent, and faced eviction.  I

17   heard that Stuart Schlesinger was "the guy" to get the big

18   settlement, respected by the courts, and feared by insurance

19   companies.

20           On April 4, 2011, he called me into his office.  The

21   case was settled and I was to pick up my check.  He closed the

22   door to the conference room and sat next to me.  "I like you, I

23   want to help, so I'm going to do something I would only do for

24   family.  But if anyone finds out, you'll be evicted

25   immediately."  He said because there was a lawsuit against the

G9u1schs

1    city for neglecting to place barricades at the street festival,

2    he would keep my settlement money, negotiate my back rent,

3    quote, make it go away, so I could stay in my apartment, pay my

4    rent going forward, and gave me money to live on.

5          A week later, on April 11, 2011, Allstate cut a check

6    for $100,000.  He forged my name.  I didn't receive my first

7    check until -- for $2300 until June 23, 2011.  For nine months

8    I begged every -- for every single check.  In one instance he

9    had me redeposit a check three times.  They all bounced.  There

10   were also -- there were always excuses.  He never gave me an

11   accounting, after repeated requests.  "It's Shabbos."  "The

12   bookkeeper is out."  He told me he was negotiating with the

13   judge over my -- he was negotiating with the judge over my back

14   rent, but he found out -- but if he found out I received a

15   settlement, he would evict me.  And as the checks started

16   bouncing, he'd scream at me on the phone, "I'll tell the judge.

17   You'll have to move in 30 days.  They'll evict you.  I offered

18   the judge $10,000 for your back rent."

19         Court documents for the lawsuit against the city

20   reveal Schlesinger never showed up to any of the hearings and

21   the case was dismissed October of 2011.  An NYPD officer

22   testified it was the responsibility of the organizers of the

23   DUMBO Arts Street Festival to make a formal request for the

24   barricades, not the NYPD.  So he sued the wrong people.

25         I kept begging him for the rest of the lump sum

G9u1schs

1   because I was so broke, they shut my phone off.  And my son was

2   so sick, and we had no money to pay bills or eat.  He wouldn't

3   answer my calls.  And then it happened -- an eviction notice

4   was placed on my door.  It was the most humiliating thing that

5   ever happened to me.  I felt so much shame.  Every day for

6   weeks I called the marshal to see when the eviction was

7   scheduled.  And when it finally came, the marshal handed me my

8   eviction papers and locked me out.  As I rolled my last bag out

9   of Peter Cooper, I was sobbing, humiliated.  Homeless for the

10  first time in my life.  I had an illustrious 40-year career in

11  advertising, and it had come to this.

12          I've tried to piece together from canceled checks and

13  bounced checks but I'm still not sure.  Suffice to say, it was

14  a living hell for nine months.  A few months after the

15  eviction, I was to receive $24,000 as a payout.  I was a

16  plaintiff in the Peter Cooper-Stuyvesant Town J-51 overcharging

17  lawsuit.  They kept the money for the back rent that

18  Schlesinger was supposed to have negotiated.  His abuse never

19  ends.

20          I now live on $24,888 a year -- my Social Security

21  plus an odd job.  I qualify for $16 a month in food stamps

22  because my Social Security check is too high.  A couple of

23  years ago I won the affordable housing lottery out of a hundred

24  thousand applicants.  I vetted for four months, and when I went

25  to get my keys, I was denied because of the eviction -- the

G9u1schs

1   eviction that never should have happened, were it not for

2   Stuart Schlesinger.  I also discovered I'm on a black list

3   because if you've ever been evicted in housing court, you go on

4   a black list, so I'll never get an apartment.  So I sleep on

5   Sheila's couch for five years, and if it wasn't for Sheila, I

6   would be dead, I'm sure.

7           I am now homeless forever because of Stuart

8   Schlesinger's bottomless pit of greed and the pursuit of

9   things.  A few months ago I saw a picture of his $11.9 million

10  house in Quogue.  Waterfront, heated swimming pool, eight

11  bedrooms, sauna, and tennis court.  All those years of

12  suffering, the eviction, putting everything in storage, the

13  pain heaped on pain, betrayal and embarrassment, my son's

14  suffering, came flooding back like a tsunami.  All this misery

15  for a beach house.

16          Thank you, your Honor.

17          THE COURT:  Thank you, ma'am.

18          Would Barbara Kaye come up and address the Court.

19          MS. KAYE:  Barbara Kaye.

20          Very hard, your Honor, to stand here in court, in U.S.

21  federal court, because Stuart Schlesinger, he broke the law.

22  He knew the law.  He was a lawyer for many, many years.  But he

23  chose to steal my money and everybody else's money, hoping he

24  wouldn't be arrested.

25          When he -- when I received my confirmation letter from

G9u1schs

the insurance company, the check was mailed to Julien &
Schlesinger in 2014, I decided to contact Stuart Schlesinger
during 2015.  On several occasions, when I called his office, I
was told he wasn't in the office.  He was never in the office.
"He will call back."  There are other times I called I was put
on hold for several minutes.  Probably he was telling them,
"Who is it?"  And when he heard it was me, he didn't want to
talk to me.  And when he did call back, which was quite rare, I
was told, "The computer crashed."  "I'm not avoiding you."
"Give me more time."  By now, I was convinced he was avoiding
my phone calls.

          The last two phone calls were quite interesting.  I
called.  A female answered the phone.  I asked to speak to
Mr. Schlesinger.  She said he wasn't in the office and she
didn't know when he will be in.  She took a message and rudely
hung up.  I didn't believe her, and I decided to call back.
And guess who answered the phone?  Stuart Schlesinger picked up
and said, "I'm not avoiding you.  Give me more time.  I will
call you tomorrow."  Which of course he never did.  I called
back the next day and told the girl he must call me back.  He
did three hours later and told me he would finish up my case
and I'll get my money and he will call me back tomorrow.  He
never did.

          It's sad to say, Stuart Schlesinger, you're a
disgrace, and you have no morals.  You could care less about us

G9u1schs

1   victims, who went through so much.

2          And your Honor, I hope when you consider the sentence,

3   you take into account what a terrible crime he committed

4   against us.

5          Thank you.

6          THE COURT:  Thank you, Ms. Kaye.

7          Would Bill Landis come forward to address the court.

8          MR. LANDIS:  Your Honor, I'd like to thank --

9          THE COURT:  Just if you would be kind enough to state

10  your name for the record.

11         MR. LANDIS:  My name is Billy Ifure (ph) Landis.

12         I'd like to thank the FBI and the victims crime unit

13  for all their help and compassion in dealing with this

14  situation.

15         I hired the law firm of Julien & Schlesinger to

16  represent me in a medical malpractice case.  The matter was

17  settled sometime in 2011, and almost immediately I grew

18  suspicious with Stuart's daily stories.  They never seemed to

19  make much sense.

20         I asked him repeatedly, almost daily, for a expense

21  breakdown related to the case.  He would deny me that, even

22  after I told him he was obligated by law to do so.  He had all

23  sorts of creative reasons why he couldn't provide the breakdown

24  of the expenses:  He was sick; his wife was sick; he even

25  blamed at one point that the funds weren't being distributed

G9u1schs

 1   because his son Michael's wife passed away and he had to take

 2   care of funeral bills.

 3           I grew more suspicious when he told me that the

 4   payments would be broken down over a period of time and that

 5   I'd be getting the checks in installments.  I didn't understand

 6   what he was doing, and when I questioned him, he grew agitated

 7   and told me he was treating me like family.

 8           At various times he gave me checks that either

 9   bounced, were issued from closed accounts, he once gave me a

10   check with his name and his wife Linda's name on it, and most

11   of these checks were never made good.

12           Then he had me meet him at his office and he wanted me

13   to submit my monthly bills to him and his accountant.  I don't

14   recall her name.  And he was supposed to be paying off these

15   bills related to my estate.  Needless to say, most of the time

16   none of the checks that were supposed to be sent out ever

17   arrived.  And it did work for a brief period, but then after

18   that, it just completely fell apart.  It was a daily battle of

19   hearing these excuses as to what happened to these funds and

20   his various stories attempting to explain what he was doing,

21   which didn't seem to make much sense.

22           The situation really got out of hand when he relocated

23   from 1 Whitehall Street downtown to 307 East 94th Street.

24   The whole office just seemed to fall apart at the new location.

25   During this time Mr. Schlesinger would give me various checks

G9u1schs

1    and he would tell me to hold them for two weeks, and that he

2    was trying to make good on these various funds.  He would

3    chronically disappear for periods of time, and then you

4    couldn't contact him.  He would just vanish like a phantom.

5              I had a problem with my bank account, and the fraud

6    division at Chase Manhattan told me that they suspected fraud.

7    They contacted Stuart, and Stuart denied it to the end, even

8    though, after the investigation from the bank, they told me

9    that the checks were issued on a closed account.  When the bank

10   officer called Mr. Schlesinger, he still insisted that the

11   checks were good, even though he knew the checks were bad.

12             The day before his arrest in Westhampton Beach, he

13   called me several times on the phone and we got into a very

14   heated exchange, at which time I called him a criminal, a

15   thief, and a sociopath, among other things.  I told him that he

16   was being investigated for his crimes, and at that time the bar

17   association had contacted me and told me that I was a victim of

18   fraud and that they were looking into Mr.Schlesinger's very

19   interesting accounting methods.  They also contacted me and

20   told me that they wanted me to fill out a complaint form, which

21   I did, and that they were referring the matter over to the FBI.

22   Soon thereafter, I was contacted by the FBI and I was told that

23   I was the victim of fraud and that Mr. Schlesinger was arrested

24   and that he was going to be hopefully prosecuted for his

25   crimes.

G9u1schs

1              I truly believe that Mr. Schlesinger has been doing

2     this for years.  This is not a one-shot deal.  I think he's

3     made this criminal behavior a way of life.  I think he just got

4     caught.  I think he's the proverbial wolf in sheep's clothing.

5     He likes to show himself off as like a grandfather figure, when

6     he's sizing you up and targeting certain victims for him to

7     take advantage of and for him to fleece them and rob them

8     blind.  I think it's despicable, I think he needs to be

9     incarcerated for the longest period of time possible, and I

10    think the strongest, harshest sentence should be imposed upon

11    him for the crimes that he's committed against me and others.

12              Thank you, your Honor.  Have a good day.

13              THE COURT:  Thank you, Mr. Landis.

14              Would Michael Kahani come forward to address the

15    Court.

16              MR. KAHANI:  My name is Michael Kahani.

17              Good afternoon, your Honor, and to the court.  Thank

18    you for allowing me to speak today.

19              My name is Michael Kahani.  I'm a 29-year-old.

20              Several years ago, I suffered a terrible medical

21    injury due to medical malpractice.  To this day I have a brain

22    injury, which affects all areas of my life.  For example, I

23    suffer from headaches, I have memory issues, I cannot continue

24    my education because I cannot read for long periods of time and

25    because I have such issues with memory, meaning that almost

G9u1schs

everything I read, I forget.  I have not been able to hold down
a job for very long either.

I hired Stuart Schlesinger as a primary lawyer to sue
the hospitals and the doctor who did this to me.  Upon starting
a lawsuit, a second group of lawyers was hired to help with the
case.

What happened to me is that I had a severe headache
for several days.  When I came to the doctor, the neurologist,
he did not follow up on the test results of finding blood in my
brain.  Instead he said it was due to anxiety.  I even came
back to him for a second MRI.  The outcome was the same results
as well, as was his response, anxiety.

Then I went to a hospital, same complaints, and the
emergency room did not even check me completely.  Through just
looking at me, they concluded I looked good enough to leave.
The doctor and persons at the hospital did not take me
seriously and sent me home, which caused the sickness to get
worse.

A few days later, I was taken to a different hospital
because, from what I was told, I was not speaking normally.  I
did not know my name, where I was, or where I lived.  It turned
out I had a disease that is very rare.  But had it been caught
by the first hospital, I would not be this sick, I would not
have almost died.  Instead, I almost died.

At the second hospital, doctors told me I was one out

G9u1schs

1    of 20 million that survived with the sickness.  I woke up in

2    the hospital, in my early 20s, forgetting how to speak English,

3    couldn't see from one eye, and didn't know where I was, the day

4    of the week, and the year.  Although I was always reminded by

5    the therapist every day.

6            I went from what to me was considered to be a normal

7    human being to what to me is now abnormal, completely not

8    normal.  I've been fired from jobs since the sickness because I

9    don't remember my job, what has to be done, or I don't

10   understand the regulation and the rules.  All of this is a

11   result of the fact the first doctor didn't take me seriously

12   when I came in.

13           The fact that I forget my schedule every day unless I

14   write it down immediately, or on my phone, is the hardest I

15   ever have to deal with, and in fact I cannot support myself.  I

16   have college loans which I haven't paid back.  I forgot

17   everything I ever learned in college which is as a result as

18   well.

19           I trusted Mr. Schlesinger.  I was told that he was a

20   top attorney.  The second group of lawyers that were hired was

21   able to get the case settled with the doctor defendant.  So I

22   got called into the second lawyer's office and was told to sign

23   an agreement that I would accept money as a settlement.  But

24   they told me that the only option I had was that Stuart

25   Schlesinger will get the money, withdraw his third, and then

G9u1schs

1    the remainder would be sent to me.  But the money was never

2    sent.  Never.  When I called Mr. Schlesinger, asking him when I

3    would get the money, he kept saying over and over, he was

4    getting it done.  I have voicemail stored on my phone where he

5    kept saying over and over, "I'm getting it done.  I'm getting

6    it done."  But nothing ever came about.  He never gave me my

7    share.

8              So I'm the victim of both theft as well as lying.  All

9    this from a lawyer -- my lawyer.  The money was supposed to

10   help me after the doctor failed, maybe not to get back to

11   normality but at least let me live just a little more

12   comfortably.  For god's sake, I use the handicapped MTA card

13   all day because sometimes my inability to stand too much and I

14   have my neurologist appointment as well as my psychiatrist as a

15   result of the sickness on a weekly basis.

16             Mr. Schlesinger also failed me.  I needed the money to

17   live.  I am still shocked Mr. Schlesinger had never -- had the

18   nerve to steal everything.  To me that isn't fair.

19             I need -- not want -- I need the money that was

20   supposed to be given to me in settlement.  I had trusted this

21   man to help me, and instead he hurt me.

22             I ask the Court to do its honest best in punishing him

23   as much as possible.  I had to rely on him because of my

24   medical condition, brain impairment.  It's clear to me he took

25   advantage of me and my medical condition.

G9u1schs

1          Also, my wife and I are expecting another baby, and I

2     can't even hold onto a job.  It seems to be getting worse and

3     worse every day.  And this could have been made somewhat easier

4     had he not lied to me and stolen from me what I deserved.

5          Thank you.

6          THE COURT:  Thank you, Mr. Kahani.

7          Would Maria Pylarinos come forward to address the

8     Court.

9          MS. PYLARINOS:  Maria Pylarinos.  A big problem from

10     my hand.  And my friend, he's give me --

11          THE COURT:  Would you just pull the microphone a

12     little closer.

13          There we go.

14          MS. PYLARINOS:  Yes.  So my friend, he's give me the

15     best lawyer in the world.  I trust.  And everything, all my

16     paper, I say, you have to sign it, because I can't sign very

17     well.  So I give me all my paper.  I trust for everything.

18          The first one, he give me one check, the small check,

19     and I go to the bank and I cash the small amount.  Second time

20     he say to me, I give me the check for next month.  Next month,

21     he say to me, I can't make it because I have to go someplace in

22     the court.  Come in next month.  This is going all the way, all

23     the time, all the time the same.  And then after he say to

24     me -- I say, careful for my Medicaid, Medicare, I have to pay

25     everything because I don't want to cut because I'm no rich to

G9u1schs

1    pay for the doctor if anything happened to me.  He said, don't

2    worry, I take care of all this kind of business for the

3    Medicaid, Medicare.  But then the Medicare, he called me up.

4    He say, Maria, you have to pay my bill, my -- for the Medicare.

5    I say, I mean, I no have money, and my lawyer, he's going to

6    pay for you everything.  And then he said to me, he said,

7    Listen, it go into collection.  Now if you no pay, I have to

8    take your Social Security.  I said, Listen, I have $500 from

9    the Social Security, and that -- that, I living for this money.

10   And he send me the letters, and I take it to the lawyer.  He

11   say to me, don't worry.  I go to call for the lawyer for

12   Medicaid and Medicare to make it very low, because it's very

13   bad.  After for that, every time he's give me the appointment

14   to see in the office and I call up the -- the man that take

15   care of the telephone, and he say to me, he's not here now

16   because he's going to the court.  And I call next day, he's not

17   here now because he's going to the doctor.  And I call him back

18   again to give me all this, he say, I no now -- I no have time

19   now to talk to you.  I call you up.  And that is go every

20   month, every month, every month.  And never he's call me up.

21   And I -- my son's came and he want to talk.  And he say, no, I

22   no have time to talk to you.  Don't worry.  I take care of your

23   mother because now is my best friend and my -- like my family,

24   so I take care of everything.  Never worry.  And he give me

25   check, and I go to the bank and then it's no good.  I go, I

G9u1schs

take it back again, and he say, don't worry, give for you new

check.  And he give me new check and he say, don't -- don't

going into the bank now.  Go to the bank after couple of months

because I have some big problem.  And I wait and give me the

date I'm going to the bank, and I'm going to the bank and the

people is laughing at me, say, what is the check?  It's no have

money in the bank.  And I take it back in, the check, and he

grabbed it from my hand.  He say, no, I'm going to give you

another check for you.  Make it after two months to cash the

check.  And I wait for the two months and I go back again to

the bank, and say, no money in the bank.  So -- and then after

I in -- the collections is received for the Medicaid and

Medicare, he send me in the second letters, and I give him, he

say, no, don't worry.  I take care of this.  You no have to

worry about it.  Everything is going perfect.  I call to the

people, he say to me, I can't find this lawyer there.  And all

the time's going like this way.

      And then my friend is show me in the computer the name

and all the story.  And then after -- already, I can't believe

it.  I'm shocked.  I can't believe it.  This man, how he's

talked to me so nice, so sweet, to happen like this way.  And

I -- I can't make it anyhow.

      I go to my friend, and my friend, he help me a lot.

      And for FBI, thank you very, very much.  Because he's

very nice man, and he helped me.

G9u1schs

```
 1              For another lawyer, above all, this story.  Already, I
 2       can't believe it.  Like this way he's making to this old people
 3       to suffer for everything.  And the lawyer, after he's -- he's
 4       making the list, to be honest to everybody and not to happen
 5       like this.
 6              I hope it's penalties so there's not another lawyer to
 7       make like this for the people.
 8              Thank you very much, your Honor.  My friend is talk to
 9       you.
10              No.  Talk to him.
11              THE COURT:  Thank you.
12              MR. COHEN:  Hello.  My name is Mark Cohen.
13              Just to expand on what Maria has shared, I think, you
14       know, unfortunately, Maria is somebody who has to lead her
15       family.  She lives in a one-bedroom apartment with her husband
16       and her daughter, doesn't really have a whole lot, and her case
17       dragged on for five years.
18              I think she talked about a lot of the things that
19       happened, but the one thing that we just wanted to address is
20       that unfortunately, for the five years that this case went on,
21       mysteriously, Maria never got any of the collection notices
22       from Medicaid or Medicare, so once this whole thing started
23       unraveling, while Mr. Schlesinger said that he was taking care
24       of the medical bills, ultimately he wasn't, so Maria's case
25       went into collections about three or four years ago.
```

G9u1schs

1          After this happened, I started digging in, was on the

2     phone with Medicare and Medicaid, on the phone with the U.S.

3     Treasury, on the phone with the collection agencies.

4     Unfortunately, Maria had to pay the bill with money that she

5     doesn't have, because ultimately the Treasury was going to

6     garnish her Social Security.  So, you know, he just put her

7     through a really difficult time.  That's super unfortunate.

8          Even though we've resolved the case with Medicaid and

9     Medicare directly, we still get collection notices on probably

10    a weekly basis.  We got the last one a couple weeks ago.  And

11    for somebody in Maria's situation to be harassed on a weekly

12    basis by a collections agency -- we told them not to call, we

13    told them to direct all communication to me, so now I get the

14    letters.  Even though we've told them it's been resolved, it

15    still happens once, twice, three times a month.

16          Thank you.

17          THE COURT:  Thank you, Mr. Cohen.

18          Would Allison Gill come forward to address the Court.

19          MS. GILL:  Good afternoon.  My name is Allison Gill.

20    And I am an attorney employed by the New York City Department

21    of Social Services, and I have been director of the

22    Supplemental Needs Trust Program.

23          NYC DSS and, by extension, the state and federal

24    government, the taxpayers, have been swindled out of a

25    significant sum of money by Mr. Schlesinger.  Supplemental

G9u1schs

needs trusts are special trusts for severely disabled

individuals that allow them to qualify for Medicaid while using

their sheltered assets to enhance their quality of life.  Upon

the disabled individual's demise, the remaining funds in the

trust are used to reimburse the Medicaid program for services

provided.

          Mr. Schlesinger established a supplemental needs trust

for one of his malpractice clients, and after many years, it

became time to wind down the trust and reimburse Medicaid.

Instead of depositing the real estate sales proceeds, earmarked

for Medicaid reimbursement, into the SNT's bank account,

Mr. Schlesinger had the closing agent write the check to his

law firm and deposit $170,000 of those funds into his escrow

account.  Mr. Schlesinger promised payment to the department

within 30 days.  But then Mr. Schlesinger used his

daughter-in-law's death as a delay tactic to hide the fact that

he had stolen the $170,000.

          The $170,000 that was pilfered from DSS in this case

does not go into my pocket or in the mayor's pocket; it goes

back to Medicaid recipients.  All of the program's revenue is

used to support the robust New York Medicaid program that

guarantees needy New Yorkers adequate and affordable

healthcare.  Those funds could have helped an elderly person

stay in their home with the help of a home health aide for the

next six years, or help a person with a severe physical

G9u1schs

1    disability attend an enriching day program for the next three

2    years.  But instead, those funds lined one person's pocket --

3    Mr. Schlesinger's.

4         The actions of Mr. Schlesinger are reprehensible and

5    appalling.  The money he purloined from the department would

6    have made a significant impact in the lives of several Medicaid

7    beneficiaries.  He should not be given a mere slap on the

8    wrist.  This was not a mistake.  This was a calculated effort.

9         Thank you.

10        THE COURT:  Thank you, Ms. Gill.

11        Is there any other victim present in the courtroom who

12   wishes to come forward and address the Court?

13        All right.  Seeing none -- is there someone?

14        AUDIENCE MEMBER:  Yes, there is.

15        MR. LAWLER:  Hello there.  My name is Kenneth Lawler.

16   I'm from the United Kingdom.

17        I employed Julien & Schlesinger when my son passed

18   away in 2009, so this was probably one of the lowest ebbs of my

19   life.  So I wanted to employ someone with a reasonable

20   reputation who was going to basically do a good job for me over

21   here in the United States.  But I haven't got any idea of how

22   the systems worked, so I had to put all my efforts -- well, all

23   my trust in a solicitor, or an attorney, in America.

24        And like everybody who spoke before me, getting the

25   actual money from the insurance people through a claim went

G9u1schs

1    through quite quickly, and everything seemed to be okay.  But

2    when we were hoping to get the money then simply from the --

3    from them to our accounts, then it all started going wrong, and

4    from -- from January in 2013 to the present day, we've

5    constantly been asking them, how is -- where is the money?

6    What do we need to do next?  How's things going?

7           And the difficulty with being over in the United

8    Kingdom is trying to keep in touch with these people, and when

9    you can't find them on the phone and you can't get in touch and

10   it's costing more and more money -- so we would sometime get

11   through with emails and things like that to contact him.  But

12   when we do -- did get in contact with him, he'd be trying to

13   quickly take me off the subject of the case and it would be

14   down to personal matters.  And even on one occasion he said to

15   me that, "Don't worry.  I'll -- I can deliver the check

16   personally and we can have a game of golf over in the UK."

17          So when I was getting comments like that, I was

18   beginning to think, this is a bit strange.  And even though --

19   there was times where I would bring it up, and he would say,

20   "Don't worry.  The -- your money is safe."  And being from

21   where I come from, when someone starts saying things like that,

22   I suddenly start thinking, something's wrong here.  Why would

23   he say my money's safe when I haven't asked if it's safe?  But

24   we kept going and pushing along, and over the years, he kept

25   going with the same excuses like everybody else has been

G9u1schs

1    giving.  Now I feel a bit of a -- sort of -- what I've been

2    hearing from these stories here -- My son has passed away, and

3    I haven't been able to finish his estate now since 2009 till

4    now.  I'm still waiting to complete his estate.  And every time

5    I have to return to this matter, it brings back all the sad

6    memories.  So that was one reason I didn't want to talk.  But

7    now I'm just waiting.

8           We were pushing him along and pushing him along, and

9    even up until he was arrested by the FBI, we were even trying

10   to get him to sort of sort out bonds and things like that, you

11   know, to try to get something out.  We were afraid if we lost

12   contact, we would lose everything completely.  But --

13          So that's it, really.  We've just been going on for

14   years and years and years with the same excuses that everybody

15   else has been giving.  And at a time when I was at my lowest

16   ebb.  I lost my son and shortly after my wife, who died of

17   cancer.  So the two combined were causing me a lot of distress.

18   And so it was difficult to -- for me personally to talk to him

19   at times.  So I managed to -- me son, me other son, started to

20   do some of the contacting, because I just couldn't at times

21   talk, talk to the guy, 'cause I would be wanting to do

22   something that probably we shouldn't be allowed to do.

23          So that's my story, basically.  And thank you for

24   letting me speak.

25          THE COURT:  Thank you, Mr. Lawler.

30

G9u1schs

1          Is there any other victim present in the courtroom who

2     wishes to address the Court?

3          All right.  At this time I will hear from counsel.

4          Mr. Richman, do you wish to be heard on behalf of

5     Mr. Schlesinger?

6          MR. RICHMAN:  Respectfully, your Honor.

7          Your Honor, I have been practicing law 52 years.  I've

8     never heard a series of stories such as this.  I'm touched.

9     And what can be said?  There's no justification, none

10    whatsoever, for actions such as this by my client.  And I make

11    no excuses for it.  And to the extent that I'm responsible as a

12    lawyer, as a lawyer, who apologizes to each and every one of

13    the victims on my behalf as a lawyer, and on behalf of my

14    client, I'm sorry for you.  I am.

15         I'm troubled by all this.  I'm troubled by the pain

16    he's caused these people, and believe it or not, prior to

17    becoming an attorney, I have a degree in social work and worked

18    as a social worker.  I see people and I see the trouble they

19    have.  And what my client has done is just reprehensible.

20         I'm also angry what he's done to the legal community.

21    I'm angry in the sense that he has made every lawyer's word

22    less meaningful.  And we have a bad enough reputation as

23    lawyers.  And to have this to be brought to the attention of

24    the community and the world at large doesn't help us.  But it

25    should be a lesson brought to every young lawyer who becomes an

G9u1schs

1    attorney to see what can happen.

2           Interestingly enough, I've known Stuart Schlesinger

3    for almost 50 years.  And it's something -- how do you balance

4    these things?  How do you?  You've seen the letters we've

5    submitted to you from people who love him and trusted him, and,

6    you know, how do you justify it?  The letters and the things

7    he's done, some wonderful things he's done, and yet the horror

8    that he's caused as well.  I guess it's true that we're made up

9    of so many different factors in our lives, with just so many

10   different complex aspects.  We're like facets of a diamond,

11   some good, some bad, some glittering, some not so glittering.

12          I don't know what caused this.  I cannot even excuse

13   his conduct.  I know that the psychiatric report indicates some

14   cognitive impairment and his other problems that he's had.

15   Doesn't justify what he did.  And I'm thinking of a thing my

16   mother used to tell me that no matter how good the milk you get

17   from the cow and all the good the cow gives you, in one kick,

18   the cow knocks over the pail and all the good milk is spilled.

19   And this is what has happened here.

20          It's easy for people to wish him all the evil in the

21   world, and I can understand how they feel.  That's the tough

22   part of being a judge.  I'm not trying to tell you what to do.

23   You know better than anybody else.  You've got to balance the

24   various equities.

25          I submitted a memorandum to you, extensive memorandum,

G9u1schs

1    as to his background, his family life.  The person that was

2    portrayed by these victims is not the same person I know, and I

3    cannot understand it.  And I'm standing here before you and

4    almost finding myself repeating it over and over.  How did it

5    become this way?  How did it get this way?  And --

6              AUDIENCE MEMBER:  Through greed.  Greed.  He knows

7    what he was doing.  He was taking victim's money.

8              THE COURT:  Please.  Silence in the gallery.

9              MR. RICHMAN:  Respectfully, your Honor, I understand

10   how the people feel.  To them there's no punishment big enough.

11   But you're going to have to frame something palatable,

12   something manageable, something in reality.  He's 76 years old.

13   And if you want to sentence him to death, you can.  And that's

14   essentially what I'm sure many of these people -- and I

15   understand it.  And there's not a bad person in this crowd.

16   But I can understand how they might even wish for that.  But

17   that would be a wrong wish.  It wouldn't be a justifiable wish.

18   It wouldn't be justice.  It wouldn't be what the system is all

19   about.  It would be the wrong thing.

20              He's done a lot of good in his life; an awful lot of

21   good.  And you've seen the letters from the people indicating

22   the extent of the decent, wonderful things he did, helping

23   people and doing good things.

24              Why he got this way, whether he was trying to save a

25   failing practice by using other people's money, it is certainly

G9u1schs

 1    not justified, if that was done.  It was just -- it was wrong.

 2    No justification about that.

 3           This is a man who's got -- his wife has problems, he's

 4    got problems.  But everybody has problems.  Everybody has pain.

 5    Everybody has difficulties.  Placed in a position of having

 6    access to money, he took advantage of that position.  I cannot

 7    justify it.  I will only ask that your Honor, in structuring a

 8    sentence herein, structure it with the concept of taking a

 9    factor into consideration, his age, and under 3553(a), his

10    medical, health, and psychological conditions, and fashion a

11    sentence that is appropriate under the circumstances.

12           I thank you.

13           THE COURT:  Mr. Richman, before you sit down --

14           MR. RICHMAN:  Yes, sir.

15           THE COURT:  -- since the summer of 2014, when

16    litigation started to be commenced against Mr. Schlesinger and

17    then grievance proceedings started and ultimately a criminal

18    investigation, what has Mr. Schlesinger done to pay restitution

19    to any of his victims?

20           MR. RICHMAN:  Your Honor, we have put everything up

21    for sale and the monies will be -- we had tried to make

22    arrangements with the U.S. Attorney's Office to arrange that

23    all the monies, whatever we get from the sale, from the sale of

24    the house, from the sale of his personal properties, they're

25    all in an auction house to be turned over to the victims, every

G9u1schs

1  single penny.

2          THE COURT:  How long has the house been for sale?

3          MR. RICHMAN:  A year and a half, sir.  It's been

4  listed and it's been shown, hundreds of times.

5          THE COURT:  But not one single offer, right?

6          MR. RICHMAN:  I don't know the economy.  One of the

7  good things is, I'm not a real estate lawyer, but apparently no

8  offers.

9          THE COURT:  Did Mr. Schlesinger and his wife give

10  three mortgages on their Dune Road property in August of 2014?

11          MR. RICHMAN:  I do not have knowledge of that, sir.

12          THE COURT:  Well, a lawyer by the name of Kriss

13  submitted a letter to the Court.  You wrote in response to that

14  letter and took exception to certain statements that Mr. Kriss

15  made.  But I'd like to know from your client whether in fact he

16  and his wife received approximately $2.3 million in August of

17  2014 from Sheldon Solow and Steven Cherniak (ph).

18          Would you consult with him.

19          MR. RICHMAN:  I will.

20          (Mr. Richman consulting with the defendant)

21          MR. RICHMAN:  Your Honor, apparently Mr. Solow was --

22  my client was indebted to Mr. Solow and he gave a mortgage to

23  Mr. Solow to protect the debt that he owed Mr. Solow.  There

24  was no money received during 2014.

25          THE COURT:  You know, the probation department pressed

G9u1schs

1    your client twice to provide financial information, and last

2    week, when I got the presentence report and saw that probation

3    was reporting that he had not given a financial statement, I

4    directed that a statement be submitted, and a statement

5    ultimately was submitted lacking in documentation.  But nowhere

6    in that statement does Mr. Schlesinger reveal that he gave

7    mortgages to Sheldon Solow, two mortgages to Sheldon Solow, for

8    a total of 2.2 million, and another mortgage for 75,000 to

9    someone named Steven Cherniak, whoever that is.  And by the

10   way, I'd like to know who that is.  And while you're conferring

11   with him, I'd like to know why he failed to disclose on a

12   financial statement, under oath, mortgages totaling

13   2.3 million, from which one could conclude that he received

14   2.3 million in about August of 2014.

15             (Mr. Richman conferring with the defendant)

16             MR. RICHMAN:  I'm informed, your Honor, most

17   respectfully, that the 75 was to Steven Cherniak, who is

18   another person he owed money to, who put a mortgage on, and my

19   client claims that he did not -- sorry -- put a lien on as

20   opposed to a mortgage at that particular point.

21             THE COURT:  Well, that's not what Mr. Kriss writes.

22   But your client and his wife gave mortgages to Sheldon Solow,

23   right?

24             MR. RICHMAN:  Correct, your Honor.

25             THE COURT:  So whatever equity was in the house they

G9u1schs

1    stripped out of the house in August of 2014 when they knew the

2    world was coming down around them, right?

3         MR. RICHMAN:  I think my client can address that

4    situation himself, your Honor.

5         THE COURT:  He'd better.

6         MR. RICHMAN:  Do you want to address that?

7         THE COURT:  No.

8         MR. RICHMAN:  Yes, your Honor.  I'm sorry.  I will

9    proceed.

10        THE COURT:  I want to know why he didn't disclose

11   these mortgages.  That in itself is a federal crime, for which

12   maybe the U.S. Attorney's Office should prosecute him.

13        (Defendant conferring with Mr. Richman)

14        MR. RICHMAN:  I'm informed, your Honor, that this is a

15   mortgage that was given prior to August '14.  It was recorded

16   August '14.  This was in lieu of an existing, outstanding

17   obligation.  That's the best of my knowledge.  At that

18   particular point.

19        THE COURT:  That excuses him from disclosing it on his

20   declaration of net worth?

21        MR. RICHMAN:  It does not, your Honor.  Obviously not.

22        THE COURT:  So back to my question:  Why did he

23   conceal it?

24        (Mr. Richman conferring with the defendant)

25        MR. RICHMAN:  He insists that he did not knowingly or

G9u1schs

1    wilfully attempt to conceal it.

2            THE COURT:  You know, my problem is that two mortgages

3    totaling 2.2 million, held by Sheldon Solow, given by

4    Mr. Schlesinger and his wife, lead me, without further

5    information, to believe that Mr. Schlesinger has $2.2 million

6    sitting somewhere.

7            AUDIENCE MEMBER:  That's right.

8            MR. RICHMAN:  Your Honor --

9            THE COURT:  Well, it's a fair conclusion for the

10   Court, especially when he withholds financial statements and

11   then doesn't disclose it, when we finally pry one from him.

12           MR. RICHMAN:  It's a reasonable inference, your Honor.

13   I agree.  I'm not suggesting otherwise.

14           THE COURT:  So I'm concerned about flight.

15           MR. RICHMAN:  Your Honor, for the moment, sir, my

16   client has his entire life here.  There's never been the

17   possibility and even a suggestion of flight.  Never in this

18   entire proceedings.  And I recognize that -- we've discussed

19   this matter.  My client recognizes that he's going to jail.  We

20   recognize the extent to which he's going to jail.  At 76,

21   whatever the sentence could be, could be the end of his life,

22   and he knows that.  And he showed up for sentence, and he made

23   no effort to avoid sentence.  And, you know, with all due

24   respect --

25           THE COURT:  He doesn't know what he's going to get at

G9u1schs

1    the moment, and every person lives in hope, and maybe he's got

2    $2.2 million sitting someplace.

3         MR. RICHMAN:  Your Honor, there is no possibility.

4    Frankly speaking, sir, I don't believe that's a reality at all.

5    And I understand why you may believe that.  We have tried to

6    address Mr. Kriss's letter on that issue.

7         THE COURT:  No.  You didn't address it on that issue.

8         MR. RICHMAN:  Well, I've spoken to the --

9         THE COURT:  The mortgages are there as clear as could

10   be.  A third mortgage to Steven Cherniak for 75,000, dated

11   August 8, 2014, and recorded March 13, 2015; a fourth open

12   mortgage with Sheldon Solow in the amount of 400,000, dated

13   August 8, 2014, and recorded April 3, 2015; and a fifth open

14   mortgage with Sheldon Solow in the amount of $1,866,285, dated

15   August 1, 2014, and recorded April 3, 2015.  Who records all

16   these kinds of mortgages in April, but they were all given in

17   August by Mr. and Mrs. Schlesinger.

18        MR. RICHMAN:  Your Honor, may I respectfully point

19   out, when we received that letter -- and we just received that

20   letter this past week -- we called the U.S. Attorney's Office,

21   we wanted to address that issue quite strongly, and the U.S.

22   Attorney and I came to the conclusion that the information

23   therein was not entirely accurate.  We did not have the chance

24   to investigate further.

25        THE COURT:  These were recorded in liber books in the

1  Suffolk County Clerk's Office.

2              (Mr. Richman conferring with the defendant)

3              MR. RICHMAN:  Your Honor, it's my understanding -- and

4  to the extent if we have to go further and do a little

5  investigation of this, we received -- I understand the U.S.

6  Attorney's Office received this letter or a similar letter

7  sometime earlier this summer.  We received a copy of this

8  letter just -- we received this letter this past week on this

9  particular information.  I never received information back then

10 to go and investigate that particular aspect of the claim.

11 When I called the U.S. Attorney's Office on this particular

12 issue, I said to Mr. Laroche, Is this an issue?  Is there a

13 problem we have to deal with on this issue?  And I said, If

14 necessary, and he said to me, Murray, there is not.  We don't

15 necessarily accept everything Mr. Kriss is saying.  And that's

16 the extent to which we had gone through this issue.

17             I am caught at a disadvantage on this particular issue

18 at this particular juncture, sir, and I wouldn't be here

19 addressing the issue like this if I were not.

20             THE COURT:  All right.  Mr. Laroche, do you want to

21 weigh in on this?

22             MR. LAROCHE:  Yes, your Honor.

23             I disagree with Mr. Richman in regards to our

24 conversation about the specific letter.  I think our

25 conversation was more to the effect of whether Mr. Kriss would

1    be speaking about the specific issues raised in this letter.  I

2    think the government's preference is that it would be limited

3    to victims, the reason being because the issues that surround

4    forfeiture and restitution are ongoing, in the government's

5    view, in terms of how the government is going to seek to

6    satisfy forfeiture and restitution and --

7             THE COURT:  Right.  But the government expressed in

8    its letter a concern about whether there was much, if any,

9    equity in the Dune Road home.  So I presume the government's

10   done a title search and that this information is accurate.

11            MR. LAROCHE:  That's correct, your Honor.  The

12   information is accurate, which is why we said in our sentencing

13   submission we have serious concerns that there is any value at

14   all in the home.  So that's an issue that the government --

15            THE COURT:  All right.

16            MR. LAROCHE:  I don't know if the Court would like to

17   hear from the government at this point.

18            THE COURT:  I do want to.

19            Mr. Richman, are you finished?

20            MR. RICHMAN:  I hate to finish on that note, your

21   Honor, most respectfully.  As an attorney and as an advocate,

22   I'm placed at a terrible disadvantage under the circumstances.

23            Your Honor --

24            THE COURT:  I got the letter the same time you did.

25   Okay?

G9u1schs

1          MR. RICHMAN:  Well, apparently --

2          THE COURT:  And it piqued my curiosity.  Especially

3     the timing.  It's so exquisite.

4          (Defendant confering with Mr. Richman)

5          THE COURT:  Mr. Schlesinger will get a chance to

6     address the Court after the government has spoken.

7          MR. RICHMAN:  Your Honor, if it is a concern from the

8     point of view of Mr. Schlesinger's failure to -- or thinking of

9     leaving the jurisdiction, I don't believe that's a reality,

10    based upon the fact that he surrendered his documents and his

11    passport, he's been here at each and every one of the

12    proceedings.  He's not young.  He's not well.  He's going

13    nowhere.  And that could be reasonably concluded.  I recognize

14    the extent of his punishment, and believe me, I've made it

15    quite clear to him, long ago, hope or no hope, that he was

16    going to jail on this case for a substantial period of time.  I

17    made that clear to him virtually the first day we got involved

18    in this case.  And when we decided to take a plea early on in

19    this matter, there was clarity, sheer clarity, that we knew

20    that jail was a reality.  Had there been a desire to abscond,

21    to leave the jurisdiction, it would have been taken advantage

22    of under the circumstances before we got to this juncture.  I

23    think reasonably, you must conclude that also.  It's not

24    absolute, but I can assure you that, you know, in all the time

25    I've practiced, I've yet to lose a client, ever, and I've had

G9u1schs

1    some interesting clients.  I don't believe it's going to occur

2    here, for whatever value you give to my word on this issue.

3              THE COURT:  The bond is essentially worthless, right?

4              MR. RICHMAN:  I don't believe so.

5              THE COURT:  Okay.

6              MR. RICHMAN:  I don't believe so.

7              THE COURT:  The government thinks so.

8              MR. RICHMAN:  Your Honor, it appears the persons who

9    have signed it are in addition to the bond.  It's not just the

10   property itself.  It's the people who have signed it.  And the

11   value of a bond is the word more than anything else.  The

12   property securing it is almost secondary, second nature.

13             I submit to you that I understand the desire to punish

14   the man under the circumstances, but is he any different than

15   any other person you may have sentenced to more serious crimes

16   and permitted him to continue?  You know, there's a desire to

17   placate, but it's not a proper thing to do under the

18   circumstances.  I can't advocate to you what you have to do,

19   but there's a balance that you have to strike, and it's not an

20   easy balance to make.  And I urge your Honor -- I know the

21   persons here would cheer if your Honor would take certain

22   action, and your Honor will be sentencing him severely to that

23   kind of action, but let's not throw the baby out with the bath

24   water.  We have a balancing act here, and a difficult one to

25   make.

G9u1schs

1          Thank you, sir.

2          THE COURT:  All right.  Thank you, Mr. Richman.

3          Mr. Laroche, does the government want to be heard?

4          MR. LAROCHE:  Yes, your Honor.

5          THE COURT:  Why don't you take the podium.

6          MR. LAROCHE:  Yes, your Honor.

7          Your Honor, over the course of eight years, the

8   defendant stole millions of dollars from two dozen victims, at

9   least.  Those he victimized were already suffering, as we

10  heard, from life-altering injuries.  Some were suffering from

11  the death of loved ones.  The defendant didn't care.  He stole

12  their money and lied to them.  He left them revictimized and

13  broken.  And he did all this not because he himself was in

14  financial destitution.  The defendant, rather, committed his

15  crimes from the comfort of his million-dollar home in Quogue

16  and from his law office in Manhattan.

17          By any measure, the defendant's crimes were

18  despicable, but the fact that he committed his crimes using his

19  law degree makes them especially disgraceful.

20          As the Court is aware, the government is seeking a

21  guidelines sentence in this case.  That's a sentence within 78

22  to 87 months' imprisonment.  We believe that all of the factors

23  the Court should consider in determining an appropriate

24  sentence counsel in favor of a guidelines sentence, and the

25  government talks about each of those factors in depth in their

G9u1schs

sentencing submission.  They include the nature of the offense,
the history and characteristics of the defendant, the need for
deterrence, the need for restitution, the nature of the
offense.

          To begin with, I'm not going to be able to describe
the offense any better than the victims have here today.  I
would just note that this offense was extremely serious, long
running, and devastating to the victims, and each of them I
think have given very powerful statements about how it has
impacted them.

          As to the history and characteristics of the
defendant, I would take issue -- and I understand Mr. Richman
is doing the best he can with what he has.  That said, I take
issue with the idea that this was a one-time lapse of judgment
or mistake that erased a lot of years of good work.  This was
eight years of blatantly lying to victims, repeatedly.  It
showed a lack of respect for the law, for basic ethical norms,
and for the property of others.  And the defendant was doing
this not because he needed to.  He could make legitimate work.
He'd been a lawyer since I think 1965, with a very successful
practice.  He simply did not need to lie and steal from the
victims the way he did.  And the only reason that he stopped
this was because he got caught.  It was because the victims
complained and people began investigating.  So the history and
characteristics of the defendant, in the government's view,

G9u1schs

1    support a guidelines sentence.

2          We also believe a guidelines sentence affords adequate

3    deterrence here.  This is a highly publicized case, for obvious

4    reasons, both just generally in the public and in the legal

5    profession.  I think a guidelines sentence, a substantial

6    sentence, would send a strong message to the legal profession

7    about what the consequences are for this type of abhorrent

8    behavior, about what can happen to you if you decide to steal

9    money from your clients for a period of years.  The defendant's

10   conduct has broken the trust of each of the victims here as to

11   the legal profession, and we think that serves as a significant

12   basis for a guidelines sentence.

13         On the need for restitution, your Honor, I think what

14   I will say is the government is doing, and will continue to do,

15   everything we can to find assets that can be forfeited, to

16   whatever extent possible, to provide restitution to the

17   victims.  The government has serious concerns for many of the

18   reasons that the Court has identified earlier, when Mr. Richman

19   was speaking, about, among other things, how forthcoming the

20   defendant has been with respect to his finances, whether that

21   particular property is going to have any value whatsoever.  We

22   understand that there are a number of significant mortgages

23   standing against that property, and the government's concerned

24   that he will have the funds to do so.  That said, there are

25   clearly assets.  He's reported some assets here, whether it be

46

G9u1schs

art or antiques.  It's something.  But it's extremely
disappointing to see the way the financial disclosures were
made in this case in the PSR, and the government has great
concerns about it, and the government is not ending its
investigation, in terms of how it's going to look at forfeiture
when this forfeiture order is entered today.  The government is
going to keep investigating those specific issues so that we
can seek as much compensation for the victims as possible
within our power.

        I'd also note that it's also troubling that the law
firm itself had a number of cases -- and I think Mr. Kriss
references this in his letter -- that were apparently
transferred to another law firm.  It's very difficult -- and
again, this gets back to what the government is still
considering, but it's very difficult to place a value on those
cases and identify them as assets that can be forfeited.  But
again, it's another aspect of the forfeiture that the
government is continuing to investigate and I think is
important to consider.

        Mr. Richman -- and I understand he's making the best
argument he can for his client.  He submitted a number of
letters from friends and family, which no doubt are heartfelt
and sincere.  But those letters are not a reason for leniency.
In fact, I think those letters should give the Court even more
pause.  I think the reason they should is because those letters

G9u1schs

```
 1    show that the defendant had the support of numerous people,
 2    including his close family and friends.  He had no reason to do
 3    this.  And the only reason that the government can come up with
 4    for why he did this was greed.  He could have at any point
 5    along the way sold his assets, gotten rid of them, paid the
 6    people that needed to be paid.  Instead he left them broken and
 7    revictimized.
 8              And the government believes that for all those
 9    reasons, he deserves a significant sentence in this case, and a
10    sentence within the guidelines range is appropriate.
11              THE COURT:  All right.  Thank you, Mr. Laroche.
12              Mr. Richman, does your client want to address the
13    Court before sentence is imposed?
14              MR. RICHMAN:  May I just speak with my client for one
15    moment, sir?
16              THE COURT:  Certainly.
17              (Mr. Richman conferring with the defendant)
18              MR. RICHMAN:  Respectfully, my client wishes to
19    address the Court.
20              THE COURT:  Very well.  I will hear from
21    Mr. Schlesinger now.  He can take the podium.
22              THE DEFENDANT:  Before I talk about the clients, I'd
23    respectfully like to address your Honor's question about the
24    mortgage.
25              Mr. Solow loaned me money over many years -- I don't
```

G9u1schs

1   recall how many years -- in different increments.  And I even

2   executed whatever his counsel asked me to execute to protect

3   the loans.  The mortgage that was executed that -- or two

4   mortgages that you referred to that was recorded, were being

5   held way before they were recorded.  I had no idea they were

6   recording it.  As a matter of fact, the letter that your Honor

7   refers to by Mr. Kriss, we never saw.  He wrote a letter to

8   your Honor and to counsel, to the U.S. Attorney, in July.  We

9   never saw it.  We were never given it.  Had I seen it, it would

10  have certainly been a bell ringing that there was mortgages.  I

11  searched everything.  The government took every single box from

12  our office --

13         THE COURT:  Do you realize what you're telling me?

14  That, in essence, it was more important to you to secure a loan

15  that a billionaire friend had given you over the course of

16  years than it was to pay back any of the clients who are your

17  victims?  Do you understand that's what you're telling me?

18         THE DEFENDANT:  That's not what I'm saying,

19  respectfully.

20         THE COURT:  Okay.  Well, that's what I'm reading from

21  that, Mr. Schlesinger.

22         THE DEFENDANT:  The money I received from him goes

23  back over maybe ten years.

24         THE COURT:  Like I said, you thought it more important

25  to see that a friend who loaned you money over the years was

G9u1schs

```
 1    secured than that the government or any victim could recover

 2    money you stole from them.

 3              THE DEFENDANT:  That mortgage was given way before any

 4    of this took place, your Honor.  That mortgage was given --

 5              THE COURT:  It's dated August 8, 2014.  You and your

 6    wife signed it on August 8 of 2014.

 7              THE DEFENDANT:  I have to --

 8              THE COURT:  I think you should move on to something

 9    else because you're not persuading me.

10              AUDIENCE MEMBER:  Thank you very much.

11              THE DEFENDANT:  I -- I came here also today to address

12    the victims.  And after hearing -- to tell them how I feel and

13    the regrets.  I'm going to do that, and then I was going to

14    address the Court, but I'd rather address the Court first on

15    other issues.

16              THE COURT:  Fine.

17              THE DEFENDANT:  I know what I did, I know the extent

18    of what I did, and I know how terrible it is.  I listened to

19    Mr. Richman, and he couldn't -- he said it the way it was.  I

20    didn't do it -- I -- whatever thought process was going through

21    my mind, it was -- at the time it was all being done, I was

22    doing it to save and try to save what I had in terms of the

23    firm and everything else.  There was no reason to do it.  It

24    shouldn't have been done.

25              I -- through your Honor, I tell the judiciary, who
```

G9u1schs

1    I've been before many courts over the last 50 years, how

2    profoundly sorry I am.  I certainly know that I'm atypical to

3    the legal profession.  This is not something lawyers do, and

4    I've insulted the legal profession, but it's atypical.  This is

5    not typical of the legal profession.

6            I don't have -- just to -- I didn't do anything

7    intentionally in that statement that your Honor referred to.

8    In fact, just to put a period to it, if I may, there were boxes

9    and boxes of documents taken from my office that I had to go

10   through for weeks and weeks and weeks in order to put that

11   statement together, and it was painstaking.  Little pieces of

12   paper.  So I finally got together a cohesive statement.  I'm

13   sure -- I'm sure that when the house is sold, Sheldon Solow is

14   not going to press his mortgage.  I'm sure when the house is

15   sold, that Sheldon Solow is not going to press his mortgage.

16   And the equity in that house from my equity is there for

17   restitution.  That house will be sold.  It's a good equity.

18   It's a good solid piece of property.  And it will be sold.

19   Yes, it's been on the market for a considerable period of time,

20   but every effort is being made to sell it, every

21   advertisement -- and it will be.  There have been some

22   not-in-writing offers that were low end.  We expect to get

23   better, and we expect it to be sold.  And the only mortgages

24   that are outstanding are -- the ones that will be pressed are

25   the ones that I put in the statement, the 5 million mortgage to

G9u1schs

1    HSBC.  I can't -- of course I can't quarrel or take issue with

2    what your Honor says about that it wasn't in the statement, but

3    I'm at loss, and I would have, but that money, again -- I'll

4    leave the issue alone.

5              THE COURT:  Fine.

6              THE DEFENDANT:  I've lost everything that I've earned

7    in 50 years.  I lost my license, I lost my respect, I have

8    terrible issues with family, and I've been punished beyond,

9    beyond -- what I deserve, but beyond what I could even handle

10   anymore.

11             To the people, I know I'm here today to be punished

12   for the horror that I committed.  I'm not going to ask for

13   forgiveness.  I heard what they said.  I can't ask for

14   forgiveness.  I took a positive with each and every one of them

15   and turned it into a horrible negative.  It started off as a

16   positive and turned it into a horrible negative.  So there's no

17   way that I could ask their forgiveness.  They didn't deserve

18   what I did.  Trying to say to them, to each and every one of

19   them, that I'm sorry, but I know the words won't be heard or

20   won't be accepted, but that's how I really feel.  I do feel the

21   remorse.  I do know I have the guilt.  I feel the guilt.  I am

22   terribly ashamed for what I did to each and every one of them.

23   There's no question about that.

24             Mrs. Last, I know the fears and the anger that I

25   caused her.  I lived through it.  I know it.  I know each

G9u1schs

1    minute that she suffers.  So to say I'm sorry and I'm ashamed

2    is not going to impact on them, but I am.

3              To Billy, to Mr. Landis --

4              MR. LANDIS:  You've got to be kidding me.  You've got

5    to be kidding me.  Don't you dare.  You're making a mockery of

6    this court system with your lies.

7              THE COURT:  Mr. Landis, please.

8              MR. LANDIS:  I can't take it anymore.

9              THE COURT:  Be seated.

10             MR. LANDIS:  How dare he.

11             THE DEFENDANT:  I know that my terrible misdeeds, my

12   conduct to him, put him in a terrible place.

13             Mr. Lawler, I know what he went through.  I know

14   everything.  I know all of this.  I've heard.

15             MR. LANDIS:  Then why did you do it?  Why did you do

16   it?

17             AUDIENCE MEMBER:  Through greed.

18             THE DEFENDANT:  I came here to say I'm sorry.  I came

19   here to put all the shame and all the guilt to these people for

20   what I did to them.  I can't turn back the clock with them.

21   But I do know, your Honor, that every effort on restitution to

22   either the lawyers fund, if they make restitution to them, from

23   my assets, will be done.  The cases that counsel -- may I, your

24   Honor.  I'm sorry.  The cases -- the cases that counsel, we --

25   we submitted a list of cases to counsel, to U.S. Attorney's

G9u1schs

1    Office.   There is tremendous equity in those cases.

2    Mr. Richman represented to your Honor in a presentation -- and

3    parenthetically, or -- Mr. Kriss refers to fees and makes --

4    every single fee that I will get or Julien & Schlesinger will

5    get must -- must be approved by the court and the manner of

6    payment, and we submitted the two that have been resolved

7    already to your Honor.   The two orders -- two Supreme Court

8    judges did that, contrary to what Mr. Kriss says.   We, in

9    one -- in fact, in one of them, the court said, pay this money

10   to the lawyers fund.   The lawyers fund wrote back and said, we

11   got it, and we're going to use it and apply it when we make

12   restitution to the clients, to the victims.   There are 50 some

13   odd -- 40, 50 some odd cases like that.   Every fee that will be

14   realized from those cases we represented, we would ask the

15   Supreme Court judge who fixes the fee, which they have to do by

16   the rules and the law, because I'm a disbarred lawyer, will fix

17   the fee and put the manner of payment down for the lawyers

18   fund, in the hope that in the interim, the lawyers fund will

19   make restitution, will pay the clients, the victims.

20        What your Honor said about the -- I don't have any

21   money, your Honor.   I don't -- what you claim that that

22   money -- it doesn't exist.   It was money from years and years

23   and years.   I understand your position, what you say about the

24   mortgage.   And quite frankly, it would have been -- it's -- I

25   know what Mr. Solow is going to do, and I didn't know that it

G9u1schs

1    was recorded, but I know what he's going to do.  He's not going

2    to press that.  Whatever we realize in profit, whatever we

3    realize from the equity will be paid, to the lawyers fund, or

4    to whoever the U.S. Attorney wants it to be paid.

5            I struggle -- I came here thinking that I would face

6    the people and do my apology and knowing that it's not the kind

7    of thing that they want to hear, but I don't know how to

8    express the sincerity that's in me about what I did.  I know

9    what I did that was terrible, I know what I did was a crime, I

10   know that I shouldn't have done it, I know -- I was struggling

11   to try to balance things in the firm.  I should have taken

12   different actions.  It's -- I sit here now saying, why didn't I

13   do it?  I've sought all kinds of help to try to figure it out.

14           What Murray -- sorry.  When Murray said to me in

15   the -- when Mr. Richman said to me, you're going to die in

16   jail --

17           I want to make restitution.  I want to be -- I want to

18   do everything that I can.  These are good things, good assets,

19   good things that can be done.  I don't want to die in jail.

20           AUDIENCE MEMBER:  You will.

21           THE DEFENDANT:  I'm sorry, your Honor.  Let me sit

22   down.

23           THE COURT:  You may be seated.

24           THE DEFENDANT:  Can I just --

25           THE COURT:  Yes, sure.

G9u1schs

1          MR. RICHMAN:  Sit down.

2          THE COURT:  The defendant, Stuart Schlesinger, comes

3    before this Court having pled guilty to wire fraud, a serious

4    crime against the United States.

5          This Court has reviewed the presentence report and

6    adopts the findings of fact in that report as its own.  I'll

7    cause that report to be docketed and filed under seal as part

8    of the record in this case.

9          I've also reviewed all of the submissions of the

10   parties and numerous victim statements and listened to

11   statements by victims here today and the arguments of counsel,

12   and the defendant's remarks to the Court.

13         Turning first to the guidelines calculation, which, as

14   the Supreme Court stated in *Gall v. United States*, should be

15   the starting point and the initial benchmark to determine a

16   sentence.  This crime sounds in fraud, and so the base offense

17   level is 7.  Because the offense here resulted in a loss of at

18   least $5.5 million, an increase of 18 levels is warranted.

19   Because there are more than 10 victims, an additional two-level

20   enhancement is appropriate.  Further, because Mr. Schlesinger

21   certainly knew that his victims were fragile and therefore

22   susceptible to his misconduct, a two-level increase is

23   warranted under Section 3A1.1(b)(1).  Moreover, because he

24   abused a position of trust and used his status as a lawyer to

25   facilitate and conceal his conduct, an additional two-level

G9u1schs

1    enhancement is entirely appropriate.

2          Now Mr. Schlesinger pled guilty before this Court, and

3    accordingly, under the guidelines, he's entitled to a

4    three-level reduction for acceptance of responsibility.

5          And so his total offense level is 28.

6          He has no prior criminal convictions, so his criminal

7    history category is I.

8          And that yields a guideline range of 78 to 87 months

9    of imprisonment.

10         Now turning to the 3553(a) factors, Mr. Schlesinger is

11   76 years old and in relatively good health.  As a consequence

12   of the criminal activity that he engaged in, he's been

13   disbarred.  For nearly a half century, Mr. Schlesinger was a

14   prominent lawyer at the apex of the personal injury bar in New

15   York.  Undoubtedly, over the course of his illustrious career,

16   he helped many people who became his clients.

17         His friends and colleagues also speak in their letters

18   of his generosity and kindness, and there's no doubt that he

19   did good works and helped people in all walks of life.

20         But this case reveals that under the veneer of an

21   accomplished and highly respected attorney, Mr. Schlesinger was

22   really a predator.  His conduct was long running and

23   devastating to the individuals he victimized.  There were years

24   and years of deceit and deception to carry out his scheme.  He

25   had to lie every day to clients on the telephone, in emails,

G9u1schs

1    and by faxes.  His conduct was reprehensible.

2           Now he earned millions and millions of dollars as a

3    contingency lawyer and also amassed a fortune in real estate,

4    but apparently it wasn't enough.  Ten years ago, he sold an

5    elegant brownstone on East 64th Street, just a few feet from

6    Central Park, for more than $21 million.

7           AUDIENCE MEMBER:  Wow.

8           THE COURT:  And back in 1981, he purchased the Dune

9    Road property in Quogue that's now appraised for more than

10   11 million.

11          His conduct in this case demonstrates a lack of

12   respect for the law, a profession that gave him and his family

13   so much over half a century.  And as the government points out,

14   his crime was not a momentary lapse.  It was a calculated

15   scheme over a period of at least eight years, that he could

16   have stopped at any time if he chose to.

17          The need for general deterrence here is obvious.  The

18   enormity of Mr. Schlesinger's criminal conduct has

19   understandably captured the attention of the public and the

20   legal profession.  All lawyers need to understand the special

21   position they hold in our society and the privileges that a

22   license to practice law confers.  And those ill-intentioned

23   attorneys who might be tempted to steal from their clients need

24   to be deterred.

25          Specific deterrence is also important here because of

G9u1schs

1    the brazenness and audacity of Mr. Schlesinger's scheme.  He

2    converted his law license to a license to steal.  It's really

3    hard to pinpoint exactly when Mr. Schlesinger started stealing

4    from his clients, but once he started, he didn't stop.  And the

5    sad thing is that he could have stopped at any moment.

6             He abused his fiduciary position as an attorney to

7    help himself to the monies that belonged to his clients, who

8    thought they were receiving compensation for the serious

9    injuries, or deaths, that they and their families had suffered.

10   And even after a client sued him and the handwriting was on the

11   wall, he didn't try to make things right.  Indeed, as I've

12   discussed in colloquy today with the parties, it appears to

13   this Court that, with disciplinary proceedings and lawsuits

14   under way against him, he instead orchestrated a scheme to suck

15   every penny of equity out of his beachfront estate on Dune

16   Road.  He gave two mortgages to his billionaire friend, and

17   now, for the last year and a half, with his wife as the listing

18   real estate agent for the property, they've offered it for

19   sale -- of course at a price so high, no purchaser ever even

20   made a serious offer.  How convenient for Mr. Schlesinger.  He

21   just spent another summer in the Hamptons.  Mrs. Schlesinger,

22   by the way, is the listing agent on the property and may be

23   eligible to receive a real estate commission from any sale.  I

24   take the government at its word that it's concerned whether the

25   property will yield any relief for the victims.

G9u1schs

1         And after Mr. Schlesinger pled guilty, he's apparently

2    been busy selling personal property, including artworks.

3    Indeed, between May 24 and July 15, after selling several

4    artworks, he deposited more than $65,000 into his wife's

5    account.  And probation reports that "the bank statements

6    reflect other significant deposits for which the sources of the

7    deposits are unknown."  So it really seems, Mr. Schlesinger,

8    that the fraudulent conduct continues.  I'm troubled by a

9    pattern of trying to obfuscate the true state of your financial

10   affairs.

11        As for restitution, the possibility that your victims

12   will ever be made whole is remote.  It will be up to other

13   lawyers, the client security fund, and the U.S. Attorney's

14   Office, to pursue your assets, including mortgage proceeds, if

15   there is 2.2 million out there, antiques, artwork, attorney's

16   fees that your former firm may still be entitled to on pending

17   matters, and who knows what else.

18        It's a very sad day for everyone in the courtroom.

19   Mr. Schlesinger had a distinguished career, but he ends it in

20   complete disgrace, disbarment, and prison.

21        The scheme went on far too long, and it's well beyond

22   the time when Mr. Schlesinger should be called to account.  His

23   conduct was outrageous and showed a complete lack of respect

24   for the law, ethical norms, and his vulnerable clients.

25        And so it's against that backdrop that I'm prepared to

G9u1schs

1    impose sentence at this time, and I'd ask, Mr. Schlesinger,

2    that you stand.

3          Mr. Schlesinger, in my remarks I have tried to convey

4    my profound disappointment in someone of your stature who has

5    fallen so far.  You're really just a thief.  And you can't be

6    honest.  You can't make an honest disclosure.

7          It is my judgment that you be sentenced to a term of

8    78 months of imprisonment, to be followed by three years of

9    supervised release, subject to all the standard conditions of

10   supervised release and the following special conditions:

11         First, that you provide your probation officer with

12   access to any requested financial information;

13         That you not incur any new credit card charges or open

14   additional lines of credit without the approval of your

15   probation officer, unless you're in compliance with your

16   installment payment schedule that I'm going to fix for

17   restitution.

18         I'm not going to impose any fine on you because that

19   would be an exercise in futility.

20         But I am going to sign the order of forfeiture and

21   impose an order of restitution on you in the amount of

22   $5,549,017, to be payable in monthly installments of 35 percent

23   of your gross monthly income over the period of your

24   supervision.

25         I'm going to direct further as a special condition

G9u1schs

1    that any and all proceeds earned by the firm of Julien &

2    Schlesinger or the cases that you transferred to your son, that

3    all of those monies be paid to the clerk of court in

4    restitution, any fees that your firm earned.

5              I'm also, of course, imposing the mandatory $100

6    special assessment.

7              This constitutes the sentence of this Court.  I advise

8    you that to the extent you've not previously waived your right

9    to appeal, you have the right to appeal.  I advise you further

10   that if you cannot afford counsel, counsel will be provided to

11   you free of cost.

12             Mr. Richman has done the very best that he can in

13   representing you.  I thought that his remarks today were

14   entirely forthright -- something that you're incapable of

15   being.

16             Now you may be seated.

17             Are there any further applications?

18             MR. LAROCHE:  Not from the government, your Honor.

19             MR. RICHMAN:  If the Court please, I ask for the

20   defendant to be considered for direct surrender.  I have

21   discussed it with the government, your Honor.

22             THE COURT:  What is the government's view?

23             MR. LAROCHE:  That's correct, your Honor.

24             THE COURT:  All right.  I think that Mr. Schlesinger

25   needs to begin serving his term of imprisonment, and so I'll

G9u1schs

```
1    give him the benefit of spending Rosh Hashanah and Yom Kippur

2    with his family, but I'm going to direct that he surrender to

3    the United States Marshal for the Southern District of New York

4    on Thursday, October 13, at 2 p.m., to begin serving his

5    sentence.

6              MR. RICHMAN:  Your Honor, most respectfully, I

7    understand the concerns you have.  The issue is about whether

8    he'll be designated by the Bureau of Prisons.

9              THE COURT:  I don't know whether he will be, but I

10   don't know where that 2.2 million is either, all right?  So

11   it's time.  He'll surrender here, to the Marshals.

12             Anything further?

13             MR. RICHMAN:  Your Honor, one further request, that

14   I'd ask your Honor to consider the designation -- I understand

15   it's not binding on the Bureau of Prisons -- but that you

16   consider the possibility of, just for the family's sake, that

17   he be sent to Otisville Correctional Facility.

18             THE COURT:  I'll make that recommendation on the face

19   of the judgment.

20             MR. RICHMAN:  Thank you.

21             THE COURT:  All right.  Anything further?

22             MR. LAROCHE:  No, your Honor.  Thank you.

23             THE COURT:  Anything further, Mr. Richman?

24             MR. RICHMAN:  Nothing, sir.

25             THE COURT:  This matter is concluded.  (Adjourned)
```